United States District Court
Southern District of New York

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/2/09
```

------------------------------------X

LINDA GRANT WILLIAMS,       :
                            :
       Plaintiff,           :       08 CV 9208 (LAP)
                            :
            -against-       :       MEMORANDUM and ORDER
                            :
CITIGROUP, INC., AND CITIGROUP :
GLOBAL MARKETS, INC.,       :
                            :
       Defendants.          :
                            :
------------------------------------X

LORETTA A. PRESKA, Chief U.S.D.J.:

Plaintiff Linda Grant Williams ("Plaintiff") filed this suit, alleging that she is the victim of the anticompetitive and tortious behavior of Defendants Citigroup, Inc. ("Citigroup"), and Citigroup Global Markets, Inc. ("CGM") (collectively "Defendants"). Specifically, she claims that Defendants and their unnamed co-conspirators have violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2; New York's Donnelly Antitrust Act, N.Y. Gen. Bus. Law § 340 et seq.; and New York's prohibitions against tortious interference with contract and prospective contractual relations, see Kirch v. Liberty Media Corp., 449 F.3d 388, 401-02 (2d Cir. 2006). Defendants now move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the motion is GRANTED.

1

I.    FACTUAL ALLEGATIONS

This suit is rooted in the world of airport terminal
financing, specifically Airline Special Facility Bonds ("ASF
bonds").  ASF bonds are issued by municipalities to airlines in
order to finance passenger terminals at airports.  (Complaint
("Compl.") ¶ 2)  Historically, ASF bonds bear high interest
rates because of the perceived financial instability of
airlines, which are required to repay the ASF Bonds to the
issuing municipalities.  (Id. ¶¶ 4, 28.)

Plaintiff is an attorney licensed in the state of New York
who specializes in "facility financing," including sports arenas
and airport terminals.  (Id. ¶¶ 5, 20.)  She developed a patent-
pending structure for ASF bonds ("ASF Bond Structure" or
"Structure"), which she alleges is superior to already-existing
ASF bonds and will provide significant financial benefits (i.e.,
lower interest rates) to airlines, airports, bondholders,
municipalities, and other interested parties. (Id. ¶¶ 48, 50.)
Defendant Citigroup, a Delaware corporation, is a market leader
in underwriting ASF bonds through its wholly owned subsidiary,
Defendant CGM.  (Id. ¶¶ 8, 21, 22.)  Defendants also trade ASF
bonds on the secondary market and sell derivatives associated
with ASF bonds.  (Id. ¶ 9.)

As a partner at Thelen Reid & Priest, LLP, Plaintiff
performed some legal work for CGM.  (Id. ¶ 126.)  She

2

subsequently joined Pillsbury Winthrop Shaw Pittman, LLP ("Pillsbury"), a firm whose services Citigroup often employed, following the suggestion of an employee of CGM. (Id.)  While at Pillsbury, Plaintiff marketed her ASF Bond Structure to CGM, which opted not to pursue the Structure. (Id. ¶¶ 49, 61.)

Plaintiff alleges that Defendants then conspired with "other banks, ASF bond underwriters and affiliates of Citigroup and CGM ('Unnamed Bank Conspirators')" and "rating agencies, airlines, municipalities, or other entities or individuals ('Non-Bank Conspirators')" unlawfully to restrain trade, primarily by blocking Plaintiff from licensing her structure for use in ASF bond issuance. (Id. ¶¶ 24, 61-73.)  Plaintiff asserts that the Defendants conspired with the unnamed conspirators to:  fire or transfer employees who favored implementation of Plaintiff's bond structure (id. ¶ 63); pressure Pillsbury to stop working on efforts to patent Plaintiff's bond structure (id. ¶ 64); demand that Pillsbury remove Plaintiff as a partner (id. ¶ 65); pressure Plaintiff's subsequent employer, Greenberg Traurig LLP ("Greenberg"), to participate and support Defendants' efforts to prevent Plaintiff's ASF Bond Structure from being used (id. ¶ 66); pressure Greenberg not to renew automatically Plaintiff's of-counsel contract (id. ¶ 67); issue new bonds with features that would prevent them from being refinanced using Plaintiff's bond

structure (id. ¶ 68); and "cause" and "convince" the Port
Authority of New York and New Jersey ("PANYNJ") not to use
Plaintiff's structure (id. ¶ 71.)  According to Plaintiff,
Defendants took these and other actions because they needed to
protect the secondary trading market for ASF bonds, which would
evaporate if ASF bonds no longer carried high interest rates,
one consequence of the adoption of Plaintiff's ASF Bond
Structure.  (Id. ¶ 60.)

Plaintiff's Complaint includes seven counts for relief.
She contends that Defendants have violated Sections 1 and 2 of
the Sherman Act, 15 U.S.C. § 1-2, by engaging in horizontal and
vertical conspiracies (id. ¶¶ 80-96), conspiracies to monopolize
(id. ¶¶ 97-106), and monopolization and attempted monopolization
(id. ¶¶ 107-118).  Plaintiff further claims that Defendants
violated New York State law, including the Donnelly Antitrust
Act, N.Y. Gen. Bus. Law § 340 et seq. (id. ¶¶ 119-124), as well
as prohibitions against tortious interference with contract (id.
¶¶ 125-133) and tortious interference with prospective
contractual relations (id. ¶¶ 134-144), see Kirch v. Liberty
Media Corp., 449 F.3d at 388, 401.  Defendants now move to
dismiss.

## II.  DISCUSSION

### A.  Standard of Review

"The court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient."  Festa v. Local 3 Int'l Bhd. of Elec. Workers, 905 F.2d 35, 37 (2d Cir. 1990).  This Court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." McCarthy v. Dunn & Bradstreet Corp., 483 F.3d 184, 191 (2d Cir. 2007).  However, that "tenet . . . is inapplicable to legal conclusions."  Ashcroft v. Iqbal, --- U.S. ----, 129 S.Ct. 1937, 1949 (2009).  Therefore, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570).  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  Id. (internal quotations and citations omitted).

### B.  Section 1 of the Sherman Act

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . ., or conspiracy, in restraint of trade or

5

commerce among the several States."   15 U.S.C. § 1.   To state a

valid claim under Section 1

> requires a complaint with enough factual matter
> (taken as true) to suggest that an agreement was
> made.   Asking for plausible grounds to infer an
> agreement   does   not   impose   a   probability
> requirement at the pleading stage; it simply
> calls for enough fact[s] to raise a reasonable
> expectation that discovery will reveal evidence
> of an illegal agreement. . . .   [A]n allegation
> of parallel conduct and a bare assertion of
> conspiracy will not suffice.

Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007).   An

agreement will not be found where the factual allegations do not

point toward a meeting of the minds.   Id. at 557.   Moreover, I

am not required to accept "terms like 'conspiracy,' or even

'agreement,'" without further, specific allegations such as

those that "identify[] a written agreement or [provide] even a

basis for inferring a tacit agreement."   Id. (quoting DM

Research, Inc. v. College of Am. Pathologists, 170 F.3d 53, 56

(1st Cir. 1999)).   Here, Plaintiff does not allege an explicit

agreement, so I must search the Complaint for circumstantial

evidence of an agreement to find for Plaintiff ultimately.

The Complaint lacks such evidentiary detail about the

conspiracy.   In Twombly, the Supreme Court expressed concern for

a defendant's responding to a complaint that "mentioned no

specific time, place or person involved in the alleged

conspiracies," since the defendant "would have little idea where

6

to begin."   550 U.S. at 565 n.10.   Accord Kendall v. Visa

U.S.A., Inc., 518 F.3d 1042, 1047 (9th Cir. 2008) ("A bare

allegation of a conspiracy is almost impossible to defend

against, particularly where the defendants are large

institutions with hundreds of employees entering into contracts

and agreements daily.")   Plaintiff's allegations do not include

evidentiary facts that could allow me plausibly to infer a

conspiracy.   She provides legal conclusions with no factual

support.   Bare legal conclusions do not suffice to maintain a

suit in the face of a motion to dismiss.[1]

### 1.   The Conspiracies

Plaintiff alleges far-reaching conspiracies among "other

banks, ASF Bond underwriters and affiliates of [Defendants],

rating agencies, airlines, municipalities, or other entities or

individuals," which "were authorized, ordered or done by their

directors, officers, agents, employees, or representatives."

(Compl. ¶¶ 24-25.)   First, she alleges that Defendants and the

Unnamed Bank Conspirators, who "ordinarily compete for the

privilege to arrange and be lead underwriters for the issuance

and placement of ASF," engaged in a horizontal boycott of

---

[1] Because Plaintiff has failed sufficiently to allege agreement,
I need not reach Defendants' argument that Plaintiff does not
have "antitrust standing."   See generally IIA Phillip E. Areeda
et al., Antitrust Law ¶ 335f (3d ed. 2007) (cautioning courts to
distinguish between a plaintiff that has no antitrust standing
and a plaintiff that has not alleged a violation).

Plaintiff's ASF Bond Structure to prevent her from participating in the market. (Id. ¶¶ 80-87.) Second, she alleges a vertical boycott of her ASF Bond Structure by municipalities and airlines, the parties that would directly benefit from lower interest rates (as obligors). (Id. ¶¶ 88-96.)

Plaintiff identifies only two parties as actual conspirators—Defendants—Citigroup and CGM. Because "a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act," Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771 (1984), Plaintiff must allege further conspirators: Section 1 does not "reach conduct that is wholly unilateral." Id. at 761. She attempts to do so by identifying a vast array of participants in the financial market (e.g., "other banks," "municipalities," and "other entities or individuals"). Plaintiff's failure to identify a single conspirator with any particularity undermines the plausibility of her conspiracy claims. See Twombly, 550 U.S. at 565 n.10 ("[T]he complaint here furnishes no clue as to which of the four [defendants] (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place."). Moreover, her allegations fail to identify in what manner Defendants acted in concert with any of these unnamed co-conspirators.

8

### a. Horizontal Conspiracy

Plaintiff's primary conspiracy theory is bereft of any detail plausibly suggesting an agreement between Defendants and the Unnamed Bank Conspirators. She argues that she need allege only more than "merely parallel conduct" and that this court should infer an agreement based on her allegations that the conspirators (1) will gain financially from a successful conspiracy; (2) had to exclude Plaintiff to preserve secondary market profits; and (3) "actually" acted in concert to prevent others from using Plaintiff's ASF Bond Structure. (Plaintiff's Opposition ("Pl.'s Opp'n") 11.) Although these allegations suffice to suggest Defendants' motivation for a conspiracy, as this Court has previously stated, "'motive to conspire' is nothing more than an assertion of interdependence." In re Digital Music Antitrust Litig., 592 F. Supp. 2d 435, 444 (S.D.N.Y. 2008). Plaintiff does not point to any specific allegations, beyond stating the conclusion that Defendants "and their co-conspirators have gone to great lengths to prevent Plaintiff's structure for ASF Bonds from ever being used" to suggest any actual concerted action. (Pl.'s Opp'n 11.)

Indeed, a careful review of the theoretical underpinnings of Plaintiff's allegations cut against their plausibility. Plaintiff alleges that her ASF Bond Structure is superior to the existing ASF bonds available and therefore threatens Defendants'

and their co-conspirators' positions in the secondary trading
and derivative markets.  Such a threat to Defendants and the
Unnamed Bank Conspirators, however, does not suggest a wide-
ranging conspiracy but rather unilateral action among the
conspirators, each of whom wants to preserve its own market
position.  See Twombly, 550 U.S. at 563 ("[R]esisting
competition is routine market conduct . . . there is no reason
to infer that the companies had agreed among themselves to do
what was only natural anyway . . . ; if alleging parallel
decisions to resist competition were enough to imply an
antitrust conspiracy, pleading a § 1 violation against almost
any group of competing businesses would be a sure thing."
(citations omitted)).

        The closest the Complaint comes to identifying one of the
Unnamed Bank Conspirators and an agreement is the allegation
that a "prominent investment bank" buckled to pressure from
Defendants and ultimately terminated its two-year license of
Plaintiff's ASF Bond Structure and ceased its promotion. (Compl.
¶ 12(d).)  This conclusory allegation, in and of itself, does
not suggest agreement; Plaintiff concedes as much as in her
Opposition. (Pl.'s Opp'n 12.)  She again urges this Court to
infer the existence of an agreement, as opposed to unilateral
action, because it would allegedly be against the Unnamed
Conspirator's own self-interest to terminate the license on its

                                                              10

own. According to Plaintiff, that bank would have eventually
become the sole underwriter for ASF Bonds due to tax-free
certification requirements of the Internal Revenue Service.
(Id.) According to Plaintiff, this would have subsequently led
to increased profits.

But the argument—that this "prominent investment bank" did
not go after one source of revenue therefore suggests agreement—
is undercut by the theory, already noted above, that there were
strong economic incentives for banks to resist utilizing
Plaintiff's ASF Bond Structure (i.e., the loss of revenues from
secondary trading and derivative markets). (Compl. ¶ 58.)
Indeed, "firms do not expand without limit and none of them
enters every market that an outside observer might regard as
profitable." Twombly, 550 U.S. at 569 (quoting P. Areeda & H.
Hovenkamp, Antitrust Law ¶ 307d, at 155 (Supp. 2006)). That
this "prominent investment bank" did not pursue one avenue of
profit—just as Defendants did not—does not plausibly suggest an
agreement between it and Defendants. See Digital Music, 592 F.
Supp. 2d at 443 & n.13 (noting likelihood that each individual
defendant was motivated by same "permissible impulse" as the
group as a whole and that "inertia" might also explain parallel
conduct.) Absent further facts supporting an agreement,
Plaintiff's allegations fail to state a claim against Defendants
for conspiring with other banks.

### b.   Vertical Conspiracy

Plaintiff also alleges that Defendants conspired with Non-Bank Conspirators to block the use of her ASF Bond Structure. Plaintiff argues that Defendants "caused," "pressed," or "convinced" various municipalities and airlines to utilize traditional ASF bonds with long "no call" periods, in effect foreclosing the possibility of refinancing using Plaintiff's ASF Bond Structure without penalty for a number of years.   (Compl. ¶¶ 69-71.)   For instance, Plaintiff alleges that on one occasion CGM caused the PANYNJ to "withdraw its [conditional] approval of Plaintiff's [ASF Bond S]tructure."   (Id. ¶ 71.)   Plaintiff has not, however, identified PANYNJ as a co-conspirator, nor has she provided any evidentiary facts that would indicate PANYNJ and Defendants conspired to harm competition by not utilizing Plaintiff's ASF Bond Structure.[2]

The argument that the airlines agreed to boycott Plaintiff also fails Twombly's plausibility test.   Plaintiff argues that the airlines must have been coerced into participating in the boycott because they would have benefitted financially from using Plaintiff's ASF Bond Structure.   (Pl.'s Opp'n 12.)   She argues that this Court should infer an agreement because the

---

[2] Moreover, as explained infra, this alleged conduct, even if it were sufficiently pleaded, would be immunized from antitrust liability by the Noerr-Pennington doctrine.   See infra note 7 and accompanying text.

12

airlines depend on the Defendants and the Unnamed Bank Conspirators "for the funds they need to continue operating" and thus the Defendants had leverage to coerce the airlines to boycott Plaintiff's ASF Bond Structure. (Id. 12.) Although Plaintiff alleges that Defendants "used that leverage," (Compl. ¶ 79), she does not allege any facts that would plausibly support this conclusory allegation. Similarly, the Complaint alleges that Defendants "threatened to exercise that coercive power," (id. ¶ 90), but it fails to include any detail about how, when, where, and which airline Defendants threatened. Furthermore, Plaintiff also alleges that the airlines have leverage over the banks by virtue of the fact that the airlines decide which banks they want to work with. (Id. ¶ 29.) Assuming that Plaintiff's structure really is superior, meaning airlines could reduce interest costs by 2% to 4% (id. ¶ 50), it is implausible that the airlines would conspire against their own interests if they had the power to utilize Plaintiff's ASF Bond Structure.

Additionally, Plaintiff alleges that Defendants demanded that her former employers (law firms Pillsbury and Greenberg) terminate her employment, which they then did. Plaintiff cites Filco v. Amana Refrigeration, Inc., 709 F.2d 1257 (9th Cir. 1983), for the proposition that demand and subsequent compliance is sufficient to constitute an agreement. But that decision's

13

continuing validity was questioned in Jeanery, Inc. v. James Jeans, Inc., 849 F.2d 1148, 1154 n.4 (9th Cir. 1988).   Rather, Plaintiff must provide sufficient factual allegations suggesting a meeting of the minds.   See Monsanto v. Spray-Rite Serve Corp., 465 U.S. 752, 764 n.9 (1989).   It is certainly not illegal for one party to announce terms of dealing and the counterparty to acquiesce to those terms absent a "conscious commitment to a common scheme designed to achieve an unlawful objective."   Id. at 764 (internal quotation marks omitted).   Since Plaintiff's Complaint lacks factual allegations that would plausibly suggest an inference of such a commitment, she has failed to state a claim.

For the foregoing reasons, the Complaint does not allege the further facts required by Iqbal and Twombly properly to allege agreement and therefore state the Section 1 claims based

14

on horizontal and vertical boycotts. Counts One and Two are therefore DISMISSED.[3]

## C. Section 2 of the Sherman Act

Section 2 of the Sherman Act prohibits efforts to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2. To state a claim for monopolization, Plaintiff must allege with sufficient detail that Defendants (1) possessed monopoly power in the relevant market and (2) willfully acquired or maintained that power through anticompetitive conduct. Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004) (citing United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)). Similarly, an attempted monopolization claim

---

[3] Plaintiff also alleges that Defendants and the Unnamed Bank Conspirators have conspired to monopolize the ASF bond market by excluding Plaintiff and her licensees from participating in that market. (Compl. ¶¶ 97-106). The elements for a conspiracy to monopolize are "(1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy." AD/SAT v. Associated Press, 181 F.3d 216, 233 (2d Cir. 1999) (quoting Int'l Distribution Ctrs., Inc. v. Walsh Trucking Co., 812 F.2d 786, 795 (2d Cir. 1987)). Because Plaintiff has failed to allege a conspiracy in violation of Section 1, her conspiracy to monopolize claim under Sections 1 and 2 (Count Three) similarly fails and is DISMISSED. See Walsh Trucking Co., 812 F.2d at 796. See generally ABA Section of Antitrust Law, Antitrust Law Developments (6th ed. 2007) 318 n.616 (listing cases in which the failure to establish a combination or conspiracy defeated a conspiracy to monopolize claim).

15

requires enough detail to suggest plausibly that Defendants (1) engaged in anticompetitive conduct, with (2) a specific intent to monopolize, and (3) a dangerous probability of achieving a monopoly in the relevant market. Virgin Atlantic Airways Ltd. v. British Airways PLC, 257 F.3d 256, 266 (2d Cir. 2001) (citing Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993)). Because of Plaintiff's failure adequately to allege anticompetitive conduct, her Complaint fails to state a claim.[4]

The crux of Plaintiff's allegations of anticompetitive conduct is that Defendants' actions excluded Plaintiff from advising clients and licensing her ASF Bond Structure. Defendants' alleged anticompetitive conduct includes: transferring or terminating their own employees to prevent the promotion of the Structure (Compl. ¶ 63); "coerc[ing] Plaintiff's law firms to terminate her" (Pl.'s Opp'n 15; Compl. ¶¶ 64-67); causing new bond issuances to have long no-call periods (id. ¶¶ 68-70); and preventing airlines from utilizing Plaintiff's ASF Bond Structure (id. ¶ 79.)

Plaintiff has combined a refusal-to-deal theory and a number of vague allegations to claim that Defendants are monopolizing the airline terminal financing market. As with her

---

[4] Because Plaintiff has failed sufficiently to allege anticompetitive conduct, I need not reach Defendants' argument that Plaintiff has alleged an implausibly narrow market.

16

Section 1 claims, Plaintiff's Section 2 claims fall short of including sufficient facts to satisfy Twombly's plausibility standard.[5] Plaintiff relies on Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117 (2d Cir. 2007), to contend that she can satisfy the plausibility requirement by alleging facts that indicate that Defendants acted for an anticompetitive purpose. But Plaintiff misreads the Second Circuit, which was distinguishing two refusal-to-deal cases relied upon by Port Dock when it made such a suggestion. Id. at 125 (noting that "the plaintiffs plausibly suggested that the defendant had an economic incentive to exclude the competitor"). Those cases involved facts entirely absent from this case: PrimeTime 24 Joint Venture v. NBC, 219 F.3d 92 (2d Cir. 2000), involved a concerted refusal to deal, and Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585 (1985), involved a refusal to deal with a former partner of a joint venture.

Plaintiff nonetheless argues that a refusal to deal is unlawful where it is done for the purpose of monopolization and where it lacks a legitimate business purpose. (Pl.'s Opp'n 14.) However, the Second Circuit has made it clear that where

---

[5] The parties submitted their pleadings prior to the Supreme Court's decision in Iqbal, which applied Twombly's plausibility standard to all actions. Plaintiff initially argues that the standard set forth in Twombly does not apply to her Section 2 claim. (Pl.'s Opp'n 13). Under Iqbal, this argument fails. Iqbal, 129 S.Ct. at 1949-50 (2009).

17

"plaintiffs do not allege that defendants terminated any prior
dealing—the sole exception to the broad right of a firm to
refuse to deal with its competitors—the allegations are
insufficient to state a unilateral-monopolization claim."  In re
Elevator Antitrust Litig., 502 F.3d 47, 52. (2d Cir. 2007).  See
also Trinko, 540 U.S. at 408 ("[A]s a general matter, the
Sherman Act 'does not restrict the long recognized right of [a]
trader or manufacturer engaged in a entirely private business,
freely to exercise his own independent discretion as to parties
with whom he will deal.'" (quoting United States v. Colgate &
Co., 250 U.S. 300, 307 (1919))).  Plaintiff does not allege that
Defendants terminated a prior course of dealing.  Indeed, her
Complaint is predicated on the allegation that Defendants
initially refused to use her ASF Bond Structure. (Compl. ¶¶ 62-
63.)  Because the Complaint is bereft of any facts suggesting a
prior course of dealing, the Defendants' alleged refusal to deal
cannot, as a matter of law, be considered anticompetitive
conduct.

     Thus, Plaintiff can only rely on allegations of behavior
that she contends collectively prevented her from participating
in the marketplace.  As noted above, Plaintiff provides vaguely
worded and conclusory allegations as to Defendants' conduct with
her former employers, Pillsbury and Greenberg, such as
"demanded" and "pressured."  But she has not plausibly suggested

that such conduct was anticompetitive, even assuming she has sufficiently pled that it occurred. She can pursue her Structure with other law firms and has neither alleged nor argued otherwise. If she can do so, the complained-of conduct (regardless of its plausibility) cannot provide a basis for a monopolization claim. See, e.g., Doron Precision Sys., Inc. v. FAAC, Inc., 423 F. Supp. 2d 173, 182 (S.D.N.Y. 2006) ("To survive a motion to dismiss, an antitrust plaintiff must also plead facts establishing that the defendants acted in restraint of trade, i.e., in a manner that robbed the consumer of its choice of product.").

With regard to the allegation that Defendant "convinced" the PANYNJ to withdraw support of her Structure, Plaintiff provides no facts to suggest that this was anything more than the result of healthy competition between banks (i.e., Defendants and JP Morgan Chase Securities) vying for a client. (Compl. ¶ 71.) See Port Dock, 507 F.3d at 121 (noting that "a complaint must allege facts that are not merely consistent with

the conclusion that the defendant violated the law, but which
actively and plausibly suggest that conclusion").[6]

Moreover, PANYNJ is "a public taxpayer-supported entity"
(Compl. ¶ 71) jointly governed by New York and New Jersey. See
N.Y. Unconsol. Law § 6451 (McKinney 2009) (PANYNJ created as "an
instrumentality or agency of the two states" to develop the port
of New York). Accordingly, Defendants' alleged conduct would be
shielded by the Noerr-Pennington doctrine, which immunizes
legitimate lobbying efforts even if they are directed toward or
result in eliminating competition.[7] See E. R.R. Presidents
Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961);
United Mine Workers of Am. v. Pennington, 381 U.S. 657, 670
(1965). Moreover, even if Defendants pressured the PANYNJ to
utilize its services, Defendants would still be immunized from

---

[6] Similarly, Plaintiff also alleges that Defendants "caused" and
"pressed" bond issuances that contain long no-call periods,
which prevent refinancing using Plaintiff's Structure.  The
Complaint does not indicate how these bonds will have an
anticompetitive effect on the relevant product market, and
elsewhere Plaintiff alleges that numerous banks compete with
each other over such issuances. (Compl. ¶ 81). Thus, this
allegation fails to support a monopolization claim since it does
not meet Twombly's plausibility standard.
[7] The Noerr-Pennington doctrine does not cover "sham" lobbying
efforts. See, e.g., In Re Tamoxifen Citrate Antitrust
Litigation, 466 F.3d 187, 216-17 (2d Cir. 2006) (discussing
applicability of doctrine and sham exception). Plaintiff has
not alleged any facts to suggest that Defendants engaged in
"sham" lobbying (nor does she raise such an argument), and thus
the alleged conduct would be immunized from any antitrust
liability even if Plaintiff had adequately alleged that
Defendants had convinced PANYNJ to abandon the Structure.

20

antitrust liability. See Doron Precision Sys., 423 F. Supp. 2d
at 189 ("Defendants are entitled to Noerr-Pennington protection
even if they pressured government officials, lied to the
government about the merits . . . , or otherwise drew the public
transit authorities into their scheme as "co-conspirators," as
long as their conduct was part of a good faith campaign aimed
a[t] securing government action.")

For the foregoing reasons, the Complaint does not allege
the further facts required by Iqbal and Twombly to state the
Section 2 claims for attempted monopolization or monopolization.
Counts Four and Five are therefore DISMISSED.

### D. State Law Claims

In addition to her Sherman Act claims, Plaintiff also
alleges state antitrust claims and state tortious interference
with contract and prospective contractual relations claims.
District courts have the discretion to exercise supplemental
jurisdiction "over all other claims that are so related to
claims in the action within such original jurisdiction that they
form part of the same case or controversy under Article III of
the United States Constitution." 28 U.S.C. § 1367(a) & (c). A
court "balance[s] the traditional 'values of judicial economy,
convenience, fairness, and comity' in deciding whether to extend
jurisdiction." Kolari v. New York-Presbyterian Hosp., 455 F.3d
118, 122 (2d Cir. 2006) (quoting Carnegie-Mellon Univ. v.

Cohill, 484 U.S. 343, 350 (1988)). These factors usually point toward dismissal. See Cohill, 484 U.S. at 350 n.7. One reason to retain jurisdiction, however, is where the remaining state law issues are easily resolved. See Waterman v. Transp. Workers' Union Local 100, 8 F. Supp. 2d 363, 369 n.2 (S.D.N.Y. 1998) (citing Brazinski v. Amoco Petroleum Additives Co., 6 F.3d 1176, 1182 (7th Cir. 1993). Here, all of Plaintiff's claims can "be determined without further trial proceedings and without entanglement with any difficult issues of state law, [so] considerations of judicial economy warrant[] retention and decision rather than relinquishment of the case to the state court." Brazinski, 6 F.3d at 1182. On balance, then, the Cohill factors lead to my exercising supplemental jurisdiction.

### 1. Donnelly Act Antitrust Claims

The Donnelly Act, N.Y. Gen. Bus. Law § 340 et seq., was "modelled on the Federal Sherman Act of 1890," and therefore "should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result." X.L.O. Concrete Corp. v. Rivergate Corp., 83 N.Y.2d 513, 518 (1994) (internal quotation marks omitted). Plaintiff has not argued for any departure from federal precedent. Therefore, I find that Plaintiff's failure adequately to allege (1) an agreement to restrain trade or (2)

22

monopolization through anticompetitive behavior is similarly
fatal to her Donnelly Act claim as it is to her Sherman Act
claims. See Digital Music, 592 F. Supp. 2d at 447 n.18 (noting
that "the substantive provisions of the Donnelly Act mirror
federal antitrust law, and thus, any New York antitrust claims
would be dismissed for the same reasons" as the federal
antitrust claims). Count Six is therefore DISMISSED.

### 2. Tortious Interference with Contract

Plaintiff claims that Defendants have tortiously interfered
with two employment contracts she had with two law firms—
Pillsbury and Greenberg. To state a claim for tortious
interference with contract under New York law, a plaintiff must
properly allege: "(1) 'the existence of a valid contract
between the plaintiff and a third party'; (2) the 'defendant's
knowledge of the contract'; (3) the 'defendant's intentional
procurement of the third-party's breach of the contract without
justification'; (4) 'actual breach of the contract'; (5) and
'damages resulting therefrom.'" Kirch v. Liberty Media Corp.,
449 F.3d 388, 401-02 (quoting Lama Holding Co. v. Smith Barney
Inc., 88 N.Y.2d 413, 424 (1996)).

Plaintiff sufficiently alleges the existence of a contract
with Pillsbury (Compl. ¶ 126) and with Greenberg (id. ¶ 130).
She also properly alleges that Defendants knew of the existence
of those contracts. (Id. ¶¶ 127, 131.) Plaintiff, however, has

23

failed properly to allege the fourth element, actual breach.
Instead, she alleges that Pillsbury "abandoned the patent
application efforts and forced Plaintiff to withdraw from the
firm" (id. ¶ 128); and that Greenberg "would not permit
Plaintiff's employment as of counsel to automatically renew as
it was set to do by contract" (id. ¶ 67).

Plaintiff does not allege that an employment contract was
breached but rather argues that her allegations, read in the
light most favorable to her, are sufficient to infer an actual
breach. But, the inferences I draw do not amount to allegations
that either Pillsbury or Greenberg "violated the terms of a
contract" with Plaintiff when each terminated her employment.
Kirch, 449 F.3d at 402. As in Kirch, Plaintiff's allegations
that her former employers "abandoned" patent application
efforts, "forced" her to withdraw, "terminated her partnership,"
or "would not permit" her contract automatically to renew do not
plausibly suggest a breach. See id. (finding allegations such
as "abandoned" and "walked away" insufficient to allege breach).
Accordingly, she has failed to plead a required element for

tortious interference with contract; Count Seven is therefore
DISMISSED.[8]

### 3. Tortious Interference with Prospective

### Contractual Relations/Economic Advantage

Plaintiff also claims that Defendants have interfered with
her prospective business relationships by "using excessive
economic coercion to compel Pillsbury" to force her out of the
firm (Compl. ¶ 136) and by "using false statements [that she was
not the sole owner of the patent] to compel Greenberg Traurig to
force" her out of that firm, (id. ¶ 141). To state a claim for
tortious interference with prospective economic advantage under
New York law, Plaintiff must allege that "(1) it had a business
relationship with a third party, (2) the defendant knew of and
intentionally interfered with that relationship, (3) the
defendant's interference amounts to 'wrongful means,' and (4)
the defendant's interference caused injury to the relationship."
Friedman v. Coldwater Creek, Inc., 551 F. Supp. 2d 164, 169
(S.D.N.Y. 2008), aff'd 321 F.App'x 58 (2009); see also Kirch,
449 F.3d at 400.

---

[8] As Plaintiff has failed sufficiently to allege actual breach,
"it follows that [she] has not alleged facts sufficient to
fulfill [the] third element, procurement of the third-party's
breach of the contract without justification." Kirch, 449 F.3d
at 402 n.6.

25

The parties disagree about whether the Defendants' alleged conduct rises to the level of culpability required by New York law. This Court has previously found that conduct that constitutes the requisite "wrongful means" must (1) amount to an independent crime or tort; (2) have been taken solely out of malice; or (3) amount to "extreme and unfair" economic pressure. Friedman, 551 F. Supp. 2d 164 at 170; accord Carvel Corp. v. Noonan, 3 N.Y.3d 182 (2004).

To begin, Plaintiff has not sufficiently alleged any independent crimes or torts. As noted above, she has not plausibly suggested any antitrust violations. Nor has Plaintiff sufficiently alleged any other crimes or torts. She does allege that Defendants defamed her by calling her "toxic" and falsely asserting that she stole the Structure from Defendants (Compl. ¶ 72); however, her allegation of "defamation" is a bald legal conclusion, unsupported by any further allegations, and "pleading the presence of false statements alone is not enough to support a claim for tortious interference." Friedman, 551 F. Supp. 2d at 170.

Second, Plaintiff does not allege or argue that Defendants acted solely out of malice. Indeed, the general thrust of her allegations is that Defendants were motivated by their own economic interests. Thus, Plaintiff must sufficiently allege

26

that Defendants' conduct amounted to "extreme and unfair economic pressure."

To do so, Plaintiff argues that Defendants "used an excessive degree of economic pressure to cause" Pillsbury and Greenberg to both terminate her employment with them. (Pl.'s Opp'n 20.)  Specifically, she alleges that Defendants threatened both Pillsbury and Greenberg "with removal from all of CGM's approved counsel lists worldwide" if each firm did not end its relationship with Plaintiff (Compl. ¶¶ 128, 132) and that both firms did so to protect the legal fees they receive from Defendants.  (Id. ¶ 132.)  As I noted previously in Friedman, New York law does not precisely define "extreme and unfair" economic pressure, but it is clear that the alleged threat by defendants of taking their business elsewhere, where nothing indicates that they acted beyond mere economic considerations, is not sufficient.  Friedman, 551 F. Supp. 2d 164, 171; see also Darby Trading Inc. v. Shell Int'l Trading & Shipping Co., 568 F. Supp. 2d 329, 345-47 (2008) (collecting cases interpreting extreme and unfair economic pressure).  Count Eight is therefore DISMISSED.

III.      CONCLUSION

        For the foregoing reasons, the Motion to Dismiss [dkt. no.

10] is GRANTED.  The Clerk of the Court shall mark this action

closed and all pending motions denied as moot.


SO ORDERED:

Dated:      New York, New York
            November  2 , 2009

_____
            LORETTA A. PRESKA, Chief U.S.D.J.